BARNES *v.* STATE.

[79 South. 815, Division B.]

CRIMINAL LAW. *Instructions. Ignoring defense.*

On the trial of a murder case where defendant set up the plea of self-defense, and the facts were close, it was reversible error for the court to instruct for the state, that if there was an intent to kill at the time the wound was inflicted the defendant might be convicted of murder, since there might have been an intent to kill in nceessary self defense, and in this case, the court held that this error was not cured by the other instructions given.

APPEAL from the circuit court of George county.
HON. J. H. NEVILLE, Judge.
Dan Barnes was convicted of murder and appeals.
The facts are fully stated in the opinion of the court.

*O. F. Moss,* for appellant.

The fifth instruction granted by the state, we submit, was very prejudical to the defendant and is simply vicious. This instruction also embodies an abstract

proposition of law, and is condemned in the *Riley case,* the *Cumberland case,* and the *Gordon case, supra.* But that is not all. The fifth instruction for the state also amounts to a peremptory instruction to find the defendant guilty. We ask the court to analyze this instruction and see exactly what it says. In the first place it tells the jury that to constitute murder there must be present premeditation *or an intent to kill.* Note the alternative. We submit that *an intent to kill* is not murder, as laid down in this instruction. Note also the concluding words of this instruction where the jury is told that it is sufficient to constitute murder if the intent to kill exists at the time the fatal wound was given.

We submit in all seriousness that the fifth instruction granted for the state does not touch the law in the case with a hundred-foot pole, and it is indeed hard for us to conceive why a district attorney would ask for, and why a trial court would give, such an instruction in a murder case where a man's life is at stake. The court in this instruction tells the jury that if there be an intent to kill at the time of the killing, the defendant should be convicted. There might have been an intent to kill on the part of the defendant at the time of the killing and the defendant might at the same time, be justified in the killing in self defense. We take it that no authorities are necessary to show that this instruction granted for the state is not only erroneous but even vicious.

Therefore, we respectively submit that the judgment of the lower court ought to be reversed and the defendant discharged because there is no competent evidence in the record to warrant the conviction.

*Frank Roberson,* Assistant Attorney-General, for the state.

The fifth instruction given the state reads as follows: "The court instructs the jury that while it is necessary

in order to constitute murder that there be present premeditation or an intent to kill, yet it is not necessary that such intent existed in the mind of the defendant for any particular length of time, but it is sufficient if the intent to kill exists at the time the fatal wound was given.''

It may be admitted that this instruction is rather awkwardly worded, but the instruction was only attempting to advise the jury as to the length of time that the intent to kill must exist in order to constitute malice aforethought or premeditated design. I think that this instruction, when taken in connection with the other instructions for the state defining malice, together with the instructions for the defendant, could not have possibly misled the jury, because of a rather inapt or awkward use of words in expressing an idea that has already been given in other terms. ''Premeditated design'' in the old statute means the same as ''malice aforethought'' in the common law definition and ''deliberate design'' in the present statute. *McDaniel v. State,* S. & M. 401; *Hawthorne v. State,* 58 Miss. 778.

STEVENS, J., delivered the opinion of the court.

Appellant was indicted for the murder of J. J. Parker, was convicted, and, the jury failing to agree as to punishment, was sentenced to the pentitentiary for life. There were no eyewitnesses to the unfortunate difficulty, and the only testimony as to the details, or as to who was the aggressor, must be found in the statements and the testimony of the parties themselves. The only testimony for the state as to the alleged unlawful assault by the accused is the dying declarations of the deceased. The state was compelled to rely upon these dying declarations to maintain its case.

Both parties are white men, and it appears that the deceased was a son-in-law of the accused. According to the dying declarations, the deceased was coming home

from his work on a June evening between sunset and dark, and was waylaid by appellant, who demanded a settlement for a debt due and owing by the deceased. The deceased offered to pay him five dollars and suggested that they go up to the house and get a cup of coffee and arrange the balance. Thereupon the appellant began to curse the deceased, and stated that he had a "settlement" to make with him, and that he was going to kill him, and with such statements started on the deceased with his pocketknife. The substance of the dying declarations was further to the effect that the deceased picked up a pine stick to defend himself, when appellant halted and agreed that they would have no difficulty if deceased would throw away his stick but, instead of shutting up his knife and avoiding the difficulty, appellant, after the deceased threw down his stick, assaulted the deceased with a knife, stabbed him in the left side, and inflicted a serious and fatal wound.

The difficulty occurred June 18, 1917, and deceased lived until August 6th thereafter. Immediately after the difficulty deceased made his way to his home near by and summoned a doctor from Wiggins, about twenty miles distant, and about midnight the physician administered to the wounds. It appears that deceased was carried to a hospital at Gulfport June 26th, and there lingered, and died August 6th.

The alleged dying declarations were testified to by S. M. Parker, a brother of the deceased, J. J. Ferth, a state witness, and R. C. Cowan, county prosecuting attorney of Harrison county. The declarations testified to by Parker and Ferth were made almost immediately after the wound was inflicted, and while the deceased was at his home awaiting the arrival of the surgeon. The other declaration, taken in the hospital at Gulfport, was testified to by R. C. Cowan, who was called in by a brother of the deceased for the purpose of hearing the statement. Mrs. J. J. Parker, the widow

. of the deceased, was also introduced by the state; but her testimony in the main was elicited by the cross-examination. In response to questions propounded by the district attorney, she stated, among other things, that the deceased "said he was cut very bad and thought he was going to die; . . . he was not positive about that; . . . I think he would have gotten well if we had the right doctor; I can't help saying that, because the cut was getting well when we took him to the hospital;" and, further, "when I saw him last, he said he thought he was going to get well in a few days; . . . that was in the hospital then." Certain letters were identified by the witness as having been received from her husband while he was in the hospital, and while these letters were introduced by the state there are expressions in the letters indicating a hope of recovery, as, for illustration:

"Go ahead, and try to make all you can, for I don't know whether I will ever get well or not; maybe the Lord will pull me through."

And in other letter:

"Save me some watermelons till I come."

Witnesses Parker, brother of the deceased, and J. J. Ferth, testify as to the serious nature of the wound which they observed; but neither of these witnesses knew anything about the altercation, or gave any testimony shedding any light upon the inquiry as to who provoked the difficulty, or who was the aggressor. There was no testimony as to any previous threats, previous difficulty, or express malice.

Appellant took the witness stand in his own behalf, and according to his testimony the parties casually met in the woods, where two "paths come together," exchanged greetings, and then got into a heated and angry discussion about the indebtedness due by the deceased to the appellant, and upon the appellant accusing the deceased and his wife with an attempt to cheat appellant out of his indebtedness, and of telling

118 Miss.—40

"falsehoods or lies" about it, the deceased thereupon resented the charge, exclaimed, "Don't you call my wife a liar; I will knock your brains out," picked up a solid pine limb about the size of one's wrist, and assaulted appellant, striking him in the face under the eye and on the head. The testimony of the accused is further to the effect that the blows of the deceased staggered him and covered his face with blood, and that it was during the fight that he drew his knife and inflicted a wound in self-defense, and without any desire to take life. It appears that the knife used was an ordinary pocketknife, which appellant carried regularly, and which was produced on the trial.

There were also introduced for the defendant witnesses Maples and De Priest, long residents of the county, who testified to the good reputation of the prisoner for peace and violence; and witness De Priest also testified that he saw the prisoner in jail the next morning after the difficulty, and that appellant's eye "was all bloodshot and swelled up," and that "he had a blue spot on the side of his head."

With the foregoing testimony the cause was submitted to a jury upon instructions, three of which appellant contends were erroneous. The instructions complained of are as follows:

No. 2: "The court instructs the jury, for the state, that murder is the unlawful killing of a human being with malice aforethought, and malice is either expressed or implied in law; express malice is evidenced by external circumstances discovering the inward intentions, and the law implies malice from the deliberate and unlawful use of a deadly weapon."

No. 4: "The court charges the jury, for the state, that the term 'malice aforethought,' as used in these instructions, means a felonious design or purpose to effect the death of the person killed, and it is sufficient in law if such purpose or design exists immediately

before or at the time of the cutting from the effects of which the deceased, J. J. Parker, afterwards died."

No. 5: "The court instructs the jury, for the state, that while it is necessary, in order to constitute murder, that there be present premeditation or an attempt to kill, yet it is not necessary that such intent exists in the mind of the defendant for any particular length of time, but it is sufficient if the intent to kill exists at the time the fatal wound was given."

It is also contended by the appellant that the proper predicate was not laid for the admission of the alleged dying declarations, and that the alleged declarations were not made under a sense of impending death. Upon the trial of the case counsel interposed no objection whatever to the admission of these dying declarations, but in the motion for a new trial did contend that the evidence was incompetent and insufficient to support the verdict.

Under our view of the testimony the fifth instruction granted the state was prejudical to the rights of the accused and constitutes reversible error. It will be observed that this is a close case on the facts. Against the positive testimony of the accused in his own behalf the state relies upon dying declarations, the statements of which are more or less general in their nature. There is no testimony of any previous difficulty or threats. It does appear that there was some controversy about an indebtedness; but the nature of this indebtedness, the amount thereof, and the extent of feeling in reference thereto are not disclosed. The testimony of the accused that there was a fight, and that the deceased was the aggressor, are supported, first, by the admission of the deceased in the dying declaration that at one time he did pick up a limb; and, secondly, by the undisputed testimony of De Priest that appellant had a black eye and a bruised head. There is nothing from the prior relationship of the parties to indicate ill will or malice. This is an alter-

cation between a father, fifty-two years old, and his son-in-law, a man much younger, and according to the proof a much larger man. With these general observations in mind, we think it unnecessary to decide any point argued, except the granting of instruction 5.

Under the state of the record, it was highly inportant for the defendant that the law be very accurately given in charge to the jury. In the first place, instruction No. 5 tells the jury that it is necessary "there be present premeditation or an attempt to kill." It may be that the word "intent" was intended to have been employed, instead of the word "attempt;" but, if so, there is nothing in the record that clearly indicates or shows a clerical error. In the second place the jury are told that "It is sufficient if the intent to kill exists at the time the fatal wound was given."

It is well to observe that all three of the instructions complained of are in general language and embody abstract propositions of law. The fifth instruction, as an abstract proposition, informs the jury that, if there be an intent to kill at the time the wound is inflicted, the defendant should be convicted of murder.

It is obvious that there may be an intent to kill on the part of any defendant who acted in necessary self-defense. The intent to kill must be felonious and without authority of law. This instruction does not attempt to apply the particular facts of this case, and, if literally followed and applied by the jury, amounted to a peremptory instruction for the state. Here the appellant, according to his version of the difficulty, was assaulted by the deceased, who was armed with a solid pine limb as big as one's wrist, and the pocketknife was not exhibited or used until after the defendant had been staggered and his face made bloody from the assaults and blows of his antagonist.

The error complained of was certainly not cured by the other instructions for the state, and especially by the general language employed in instruction 2 and 4

complained of. On the contrary, instruction 2 told the jury without qualification that "the law implies malice from the deliberate and unlawful use of a deadly weapon;" while instruction 4 emphasizes the abstract legal proposition that "it is sufficient in law if such purpose [the felonious purpose to effect the death of the person killed] or design exists immediately before or at the time of the cutting from the effects of which the deceased, J. J. Parker, died."

While the law of homicide has an important place in our system of jurisprudence, and law enforcement is essential to the protection and well-being of organized society, yet the right of the accused to a trial in which the law is accurately stated is, in a case of this kind, a right as dear to him as life itself. Authorities on the point are, we think, unnecessary, through we refer to *Gamblin* v. *State,* 29 So. 764, and *Murphy* v. *State,* 89 Miss. 827, 42 So. 877.

*Reversed and remanded.*